## BOWLES, Acting Administrator, Office of Price Administration, v. GOOD LUCK GLOVE CO.

### Civ. No. 360–D.

District Court, E. D. Illinois.

Dec. 17, 1943.

Harry E. Witherell, of Galesburg, Ill., and Bruce Thomson, of Springfield, Ill., for plaintiff.

Charles E. Feirich, of Carbondale, Ill., for defendant.

LINDLEY, District Judge.

Plaintiff charges that defendant, subsequent to May 11, 1942, sold certain of its products above what constituted proper ceilings fixed, under the statute, by the regulations of the Office of Price Administration, and seeks a preliminary injunction from continuation of such practice.

Defendant is an extensive manufacturer of work gloves, listing in its catalogue some 480 different models. Some of these are for children, some for ladies and others are mittens, with none of which we are now concerned. Defendant's business, as a result of many years' operation, is extensive; its customers are many, including jobbers, mail order houses and the United States Government.

About the first of December, 1941, defendant issued its price list, controlling until March, 1942, sending it to some 4,000 dealers. In the months of January and February following, however, defendant's sales representatives were instructed not to make further quotations of these prices. Some time near the middle of March, it placed a new price list in mimeograph form with its representatives in the various territories covered. This was then printed and circulated among the trade on March 20. The regulation upon which plaintiff relies became effective May 11, 1942, and provided in effect that the ceiling prices should be the highest prices charged for goods delivered in March, 1942. It is agreed that defendant at no time sold merchandise in excess of the price list issued in March. Nor did it, in March or at any time thereafter, sell or deliver goods at less than the March 20 prices, except on previous commitments.

The alleged violations are grounded upon the sales of ten models to various customers as follows: Workhound, Red Seal, Lastikbak, Red Crown, Top Notch, Good Housekeeper, Zebra, 25–P and Angora–D and 958–D. Plaintiff's investigators found, from examination of the records of defendant, that the only deliveries of each of these models made in the month of March were charged at prices less than those quoted in March; and concluded, therefore, as plaintiff now contends, that these were the highest prices charged for these respective models delivered in the month of March and constituted the ceiling prices therefor, and that sales of the same articles made subsequent to May 11 were at more than these ceiling prices even though not in excess of the quotations in the price list of March 20, 1942. In other words, it is plaintiff's theory that inasmuch as deliveries of these certain models made in March were at prices below the March quotations, under the statute and regulations, these sales prices became the ceilings with which all future sales must comply.

The evidence discloses that the deliveries thus made the basis of plaintiff's computation possess two characteristics, namely: (1), they were deliveries made in March in pursuance of fixed commitments upon contracts for continued delivery entered into many months prior, upon which defendant was bound to make deliveries in accord with its contracts, and (2) the prices charged for these models subsequent to May 11, were in accord with the quotations of March and were the same as those charged for similar models in March except as the articles varied in weight of the cloth or the side thereof presented to the exterior of the glove or in the addition of a leather thumb or of a leather index finger or a leather strap on the palm or a leather strap on the back to protect the knuckles or in differently styled cuffs or in some other minor particular. Each of these minor differences was represented by a long-established differential in price necessitated by the additional cost of the added feature. Certain models differed from others only in that they were made of heavier or lighter materials.

■ I am of the opinion that it was not the intent of Congress or of the Administrator to fix the ceiling as of March at the price fixed on outstanding contracts antedating March by several months.

Obviously it was the intent to fix the ceilings at not higher than the highest prices charged for sales made and completed in the month of March. The language of the Act, 50 U.S.C.A. Appendix, § 901 et seq., so indicates. Had defendant's old contracts been completely executed prior to March and had no deliveries of the specific articles been made in March, the ceiling prices for them would necessarily have had to be determined by reference to the highest prices charged for same or similar goods. Under the construction urged by plaintiff, inasmuch as the same or similar goods were sold at higher prices than those fixed on prior commitments, there would then have resulted a situation wherein defendant could legitimately have sold for more money, an article costing less than the one actually delivered and would have been compelled to sell the more expensive model at a loss. In other words, it was the evident purpose of the regulation to fix ceiling prices as of March and not as of the date of old commitments, say, in September of the year before. For this reason, the regulation reads that the ceilings shall be

the highest prices charged for deliveries made in March.

That it was not the intent of the Office of Price Administration to place the manufacturer in a dilemma as a result of which the latter would be compelled to sell less expensive goods at a greater price than more expensive goods is apparent from the interpretation of the regulation by that office. Thus it said, in a press release on December 4, 1942: "Sellers who made general price increases prior to April 1 are authorized by the Office of Price Administration today to apply the increases to ceiling prices for goods and services delivered last March under long-term contracts. * * * The effect is to allow one, who last March delivered at prices established by a contract signed many months before and who raised his prices generally before April 1, to bring his prices on the expiration of the contract in line with the increased prices he was charging in March. March is the base price period under the two regulations. * * * Hitherto the price-raise provision of these two regulations allowed a seller to apply his general price increase only to those classes of purchasers for whom the increase was announced before April 1 for delivery during March. Since there was no occasion for a seller to announce a price increase for delivery in March to customers under long-term contracts which did not expire in March, the price-raise provision was usually inapplicable to such customers. The new provision permits a seller to increase ceilings for goods delivered to customers under contract in March if the seller (1) announced a general increase prior to April 1, (2) delivered some goods at the higher price in March, and (3) delivered no goods in March at less than the new higher prices to such customers, aside from deliveries under the contract."

And it announced on August 20, 1942, "if, after the general price increase, the seller delivered to a class of purchaser only at a lower price, the lower price is the maximum price, unless the delivery was made under a contract. * * * The amendment liberalizes this provision to permit similar adjustment in these situations. * * * where delivery was made after the price rise at a lower price under a previous contract." A similar release of September 12, 1942 read: "An offering price for delivery during March may exist for a commodity even in the absence of an actual quotation of a price for delivery during that month.

Thus if a seller offered to deliver in March a commodity whose price always differed from that of another commodity by a well-established differential the seller would, in the absence of special circumstances, be considered as having an 'offering price for delivery' in March for the second commodity. It would consist of the prices quoted in March for the first commodity with the well-established differential added or subtracted as the case required."

■ I conclude, therefore, that the investigators for plaintiff were in error as a matter of law when they fixed the ceilings of certain gloves at prices upon which defendant had become committed some months before rather than at the highest prices current in March as contemplated by the regulation.

■ And I agree with defendant that the proper ceiling for the articles complained of, where no shipments were made of a specific model in the month of March, except on prior existing commitments, was the price charged for similar or identical merchandise. I do not consider it necessary to enter into any nice exposition of the meaning of such words as "same," "identical" and "similar." Obviously, if things are the same, they are identical. If they are similar, they are in a major degree the same, varying not greatly. But the law is not concerned with trifles.

Defendant's products begin with a simple cotton flannel glove and from this basic form other models have developed. The basic gloves may be made of standard eight-ounce cotton or from a lighter or a heavier weight. As to gloves differing only in the weight of material, defendant has had for a number of years an established differential in prices, based upon the additional cost of material. The basic gloves may be made with a knit wrist, or with a gauntlet. Again the differential in cost and in the resulting selling price is a long-established one. A further step is to make the palm of the glove and the interior of the fingers of leather. This necessitates an additional item of the cost of leather over cotton flannel, but the gloves are identical otherwise. The leather palm glove is, in some models, changed by placing on the back a leather strap to protect the knuckles on the back of the hand; some models have a strap of leather below the cuff to furnish protection at the place of greatest wear. Some of the gauntlet cuffs are soft, some

are stiff, designated starched, but the difference in cost is trifling, dependent upon the exact amount of added material or labor and is reflected in long-existing differentials. The models progress step by step from the basic cotton flannel glove. Some products are adapted to greater resistance of long wear. Each step from the preceding model is a short one of inconsiderable character and reflects a fixed differential in cost of material and labor and in resulting selling prices.

The Workhound glove is in all material respects the same as Zebra, Leopard and Stocky R, except as to the cuff or in some other minor particular. Red Seal is similar to Turtle Neck,—one is a ten-ounce and the other twelve-ounce glove. Red Crown is similar to Utility but of slightly different cut. Top Notch 207 is equivalent to Top Notch 206 except that the cuff is different. One bears a twenty-five cent per dozen differential over the other. One has a gauntlet cuff and one a safety cuff, the difference in cost being fixed by long-established facts derived from experience. The Zebra is equivalent to the Workhound except that one is of striped cotton and one of white cotton, resulting in a differential of 2½ cents per dozen. The 25-P is to all intent and purpose the equivalent of Pioneer 85, the differences being in the color and in the cuff, one being starched and one soft. There exists a long-established differential of twenty-five cents per dozen in the sales prices. In short, for all practical purposes, for each model not sold in March there is an identical or equivalent model that was sold. This is identity within the contemplation of practical determination.

Defendant, in fixing its sales prices as to each article, has preserved at all times the same differential between the different models and it has in no instance charged more for its gloves than the prices quoted in the price list of March 20, prior to promulgation of the regulation, plus or minus the differential for similar or equivalent gloves. This results in consistency in price quotations. It avoids violation of the edict of Congress, obviously intended to prevent upsetting business practices, provided by Section 2(h) of the Act as follows: "The powers granted in this section shall not be used or made to operate to compel changes in the business practices, cost practices or methods, or means or aids to distribution, established in any industry, except to prevent circumvention or evasion of any regulation,.order, price schedule, or requirement under this Act."

If plaintiff's position were correct, inconsistency, indeed, in some cases near chaos, would result. More expensive goods would have to be sold at less than less expensive goods, resulting in loss or in elimination of the more expensive article from manufacture. I think it was never the intention of the Congress or of the Office of Price Administration, in providing anti-inflationary rules, to fix by highly technical construction, a ceiling price in May, 1942, at prices charged in March for goods delivered on previously existing contracts and thus upset or disturb the economic practices of industry contributing essential war goods. I believe, rather, that it was the intent to fix the ceiling at the highest current price of March and, where deliveries were not made upon current purchases but only upon previous purchases, then to fix the ceiling by reference to the prices of equivalent, similar, or substantially the same merchandise, which experience has demonstrated bear a certain fixed ratio in. price to that of those actually sold in March. The regulations disclose this fair and honest intent, founded upon common sense and reason, and the declarations of the Administrator demonstrate the same thought.

This case has been fully and fairly presented by able counsel in a manner greatly helpful to the court. Though the documentary evidence is voluminous, in the end there is little or no dispute as to the facts. Wholly absent is evidence of an intent upon the part of defendant to charge any more after May 11 than its quoted prices of March, and the prices since charged have been fixed in every instance by the current March prices. This, under the circumstances pointed out, I think, is compliance with the intent and purpose of the legislation and of the regulation. I conclude that the plaintiff has not proved violation of ceiling prices by defendant. Hence the application for a temporary injunction is denied.

This memorandum shall constitute a part of my findings of fact and conclusions of law adopted contemporaneously herewith.